JAMES R. PAYNE, EMPLOYEE, PLAINTIFF v. CONE MILLS CORPORATION,
    EMPLOYER, AND LIBERTY MUTUAL INSURANCE COMPANY, CARRIER,
    DEFENDANTS

No. 8210IC215

(Filed 15 February 1983)

Master and Servant §§ 68, 91— workers' compensation—occupational disease—
time for filing claim

   The Industrial Commission erred in concluding that plaintiff timely filed
   his claim on 17 October 1979 for workers' compensation under G.S. § 97-58(c)
   where plaintiff's disability began on 26 November 1970, which was the day he
   went to the hospital emergency room because he had difficulty breathing and
   the last day he worked for defendant employer, where plaintiff received
   hospital treatment for "asthmatic bronchitis secondary to exposure to textile
   particles" from 30 November 1970 to 14 December 1970, and where his physi-
   cian advised him not to return to the mill because of the "work environment."
   Although plaintiff's condition was not diagnosed until 4 December 1979, plain-
   tiff was informed by competent medical authority of the nature and work-
   related cause of his disease in 1970.

   Judge EAGLES concurring.

   APPEAL by defendants from the North Carolina Industrial
Commission. Opinion and award filed 7 December 1981. Heard in
the Court of Appeals 13 January 1983.

   Plaintiff filed a claim with the North Carolina Industrial Com-
mission on 17 October 1979 to recover workers' compensation for
chronic pulmonary disease caused by exposure to cotton dust in
defendant employer's cotton mill where plaintiff worked from
August 1927 to 26 November 1970. This case was heard by Depu-
ty Commissioner Ben E. Roney, Jr. of the North Carolina In-
dustrial Commission who made findings of fact and concluded that
plaintiff had not filed claim "within two years after determining
that his pulmonary disease was occupationally related." There-
fore, the deputy commissioner held the plaintiff's recovery was
barred by N.C. Gen. Stat. § 97-58(b) and (c).

   The full Industrial Commission reviewed the case on 19
November 1981 and filed an opinion and award on 7 December
1981 which reversed the Deputy Commissioner's ruling and
granted plaintiff's claim. Chairman Stephenson filed a dissenting
opinion. The Commission made the following pertinent findings of
fact:

. . .

3. Plaintiff was exposed to cotton dust, an occupational hazard peculiar to and characteristic of the textile industry and known to result in chronic obstructive pulmonary disease, during those 43 years.

. . .

7. Plaintiff was experiencing a bad cough and severe shortness of breath by the end of the working day on November 26, 1970. He went to the hospital and was seen in the emergency room on the evening of that date and received treatment for his affliction. He was admitted to the hospital by Dr. R. B. Steelman on November 30, 1970. Plaintiff was treated by Dr. Steelman for asthmatic bronchitis secondary to exposure to textile particles, the exact allergen unknown, but was not given clinical pulmonary tests. He was discharged from the hospital on December 14, 1970 in an improved condition.

8. Dr. Steelman advised plaintiff not to return to his job because of his "work environment" but did not advise him that he was suffering from a permanent lung condition or otherwise inform him of the nature and work-related cause of his occupational disease.

9. Plaintiff continued to consult Dr. Steelman after his discharge from the hospital until his condition was diagnosed on December 4, 1979 by Dr. Herbert A. Saltzman, a member of the Commission's Textile Occupational Disease Panel, upon referral by the Commission.

10. Plaintiff filed a claim for compensation for disability caused by his pulmonary disease on October 17, 1979, prior to the diagnosis of his condition by Dr. Saltzman on December 4, 1979.

. . .

Based on these facts, the Commission concluded the plaintiff's claim had been filed within the statutory time period and awarded plaintiff compensation. From the Commission's opinion and award, defendants appealed.

*Boone, Wall, Higgins, Chastain & Dennis, by Peter Chastain for the plaintiff, appellee.*

*Smith, Moore, Smith, Schell & Hunter, by J. Donald Cowan, Jr. and Caroline Hudson for defendants, appellants.*

HEDRICK, Judge.

The sole issue on this appeal is whether the plaintiff filed his claim within the statutory time period set out by N.C. Gen. Stat. § 97-58(b) and (c) which in pertinent part provides:

> (b) The report and notice to the employer as required by G.S. 97-22 shall apply in all cases of occupational disease except in cases of asbestosis, silicosis, or lead poisoning. The time of notice of an occupational disease shall run from the date that the employee has been advised by competent medical authority that he has same.

> (c) The right to compensation for occupational disease shall be barred unless a claim be filed with the Industrial Commission within two years after death, disability, or disablement as the case may be. . . .

In *Poythress v. J. P. Stevens*, 54 N.C. App. 376, 382, 283 S.E. 2d 573, 577 (1981) *disc. rev. denied*, 305 N.C. 153, 289 S.E. 2d 380 (1982), this court, in affirming the Industrial Commission's dismissal of a claim as not having been timely filed, held:

> [T]he two-year time limit for filing claims under N.C.G.S. 97-58(c) is a condition precedent with which claimants must comply in order to confer jurisdiction on the Industrial Commission to hear the claim.

In an earlier case, *Taylor v. Stevens & Co.*, 300 N.C. 94, 102, 265 S.E. 2d 144, 149 (1980), our Supreme Court interpreted N.C. Gen. Stat. § 97-58 and held:

> [W]ith reference to occupational diseases the time within which an employee must give notice or file claim begins to run when the employee is first informed by competent medical authority of the nature and work-related cause of the disease.

In the present case the defendant was hospitalized because of his condition in November 1970, and he did not return to work for

Payne v. Cone Mills Corp.

the defendant employer after his hospitalization. Yet, the plaintiff did not file claim with the Industrial Commission until October 1979, almost nine years after he stopped working. However, the plaintiff contends the statutory time period did not begin to run until 4 December 1979, which was two months after he filed his claim on 17 October 1979, because he was not informed that his disease was brown lung or byssinosis, an occupational disease, until that date. He further argues that the medical advice he received in 1970 was insufficient to inform him of "the nature and work related cause of the disease." We do not agree.

The parties stipulated that plaintiff's disability began on 26 November 1970, which was the day he went to the hospital emergency room because he had difficulty breathing and the last day he worked for defendant employer. The Commission's findings of fact reveal that the plaintiff received hospital treatment for "asthmatic bronchitis secondary to exposure to textile particles" from 30 November 1970 to 14 December 1970 and that his physician, Dr. R. B. Steelman, advised him not to return to the mill because of the "work environment." With respect to the communication between plaintiff and Dr. Steelman, the record discloses Dr. Steelman's deposition, which was taken by telephone on 10 December 1980, ten years after his original diagnosis:

. . .

I have read briefly those documents which you sent me earlier, including a letter from Dr. Sam LeBauer to Mr. Chastain dated September 22, 1980, a History and Physical consisting of two pages on Moses Cone Memorial Hospital forms, and a third document entitled Discharge Summary from Moses Cone Hospital. To the best of my knowledge, the History and Physical from Moses Cone Hospital consisting of two pages dictated on the 28th of January, 1971, and the discharge summary consisting of one page signed by me with the same date accurately reflect the history, examination, and diagnosis of Mr. Payne as done by me in January of 1971. These documents refresh my memory as to my seeing and treating Mr. Payne. I recall Mr. Payne. I do not really recall specific conversations I may have had with Mr. Payne concerning the causes of his condition that required his hospitalization.

There is a diagnosis at the bottom of the one-page discharge summary signed by me. I think I did have a conversation with Mr. Payne about my diagnosis as indicated on that form. He was quite ill, and I think the history reflected that his *symptoms were related to exposure to something at work he felt. Because of that I suspected that he might be allergic to some airborne allergen at work.* Historically, that seemed to be the case and I was suspicious of that. *Mr. Payne suspected that something at work was related to the problems he was experiencing at this hospitalization.* I really don't recall specific conversations. I recall Mr. Payne, the kind of illness that he had, and obviously the hospital records, but I don't recall specific conversations that I had with him.

Referring to the first page of the History and Physical under the paragraph entitled present illness, where it is indicated that Mr. Payne was an elderly white man with a *long history of exposure to textile particles who has experienced repeated episodes with asthma, and that his history of wheezing goes back four years and occurs after exposure to his work environment,* to the best of my recollection that was the history given to me by Mr. Payne. The history of present illness reflects what the patient has told the physician and is recorded in that manner. Keeping in mind what Mr. Payne told me and referring again to the diagnosis on the bottom of the one-page discharge summary, and concerning whether I had any conversations with Mr. Payne indicating that *he had asthmatic bronchitis secondary to exposure to textile particles, I am sure that I expressed that I was suspicious that that was the cause of his respiratory difficulty.* It is not a proven diagnosis, but I suspected that his asthmatic bronchitis was secondary to exposure to textile particles.

Q. Do you recall any recommendations you made to Mr. Payne concerning continued employment in the textile industry at this time?

A. Well, I don't recall specific conversations, but I wouldn't be surprised if I suggested that if repeated exposure seemed to provoke repeated respiratory difficulty that it might be wise that he not expose himself ah to that work environment.

As to whether I recall making any statements to Mr. Payne to the effect that he should not go back into the card room at Cone Mills or dusty areas in that plant because it would kill him, I think that what I expressed is what I have already recounted to you, and that was *concern that exposure to airborne particles at work might be responsible for his respiratory insufficiency and that it was concordant with his previous history that he might consider not exposing himself to that environment.* . . . (Emphasis added.)

The plaintiff also testified as to his understanding of what Dr. Steelman told him:

. . .

I was in Dr. Steelman's office the first time I ever saw him. He conducted an examination of me in his office. He asked me to blow into a tube. After Dr. Steelman did this examination and before he put me in the hospital, Dr. Steelman told me the results of the examination in his office.

Q. What did he tell you?

A. He told me I had a breathing problem; probably had asthma, emphysema or something like that. People didn't know anything about a brown lung then.

After Dr. Steelman told me that I had a breathing problem he admitted me to Moses Cone Hospital the same day. I stayed in Moses Cone Hospital about sixteen days. While I was in Moses Cone Hospital Dr. Steelman was my main doctor. He continued to conduct breathing tests on me, and he gave me medication for my breathing problem. When Dr. Steelman discharged me from the hospital after the sixteen-day stay, he said I would always have a breathing problem, and that he could not cure the whole thing. He gave me some medicine to take and told me I would have to take it as long as I lived. I'm not sure if Dr. Steelman saw me anymore after that. I was not admitted to Moses Cone Hospital anymore that I know of.

After I saw Dr. Steelman and he admitted me to Moses Cone Hospital, I did not see any other doctors for my breathing problems other than Dr. Saltzman. I had been see-

ing Dr. Bonner before I saw Dr. Steelman. When Dr. Steelman discharged me from the hospital he said something to me about not going back to work in the card room. He told me if I went back in the card room and got in the same shape not to come to him because he couldn't do anything else for me.

Q. What did Dr. Steelman say would happen if you worked in the card room again?

A. He said it would kill me.

Q. Did he tell you why?

A. Yeah, said the dust would kill me.

Q. The cotton dust?

A. Yes, sir.

Q. And did Dr. Steelman tell you this when he discharged you from the hospital sometime in December 1970?

A. Yes, sir.

. . .

We hold such communication, in November and December 1970, by a competent physician to the plaintiff was sufficient to inform him of the nature and work-related cause of the disease and of the plaintiff's disability. The evidence in the record does not support the Commission's critical Finding No. 8. The evidence in the record will support only a finding that Dr. Steelman, during December 1970, did advise and inform the plaintiff of the nature and work-related cause of his disease. We hold the Commission erred in concluding that plaintiff timely filed his claim within the meaning of N.C. Gen. Stat. § 97-58(c). We hold plaintiff failed to comply with N.C. Gen. Stat. § 97-58(c) so as to confer jurisdiction on the Industrial Commission. The opinion and award of the Industrial Commission, therefore, must be vacated.

Vacated.

Judges JOHNSON and EAGLES concur.

Judge EAGLES concurring.

I am compelled to concur based on the language of the statute, G.S. 97-58(b), and the failure of the statute to describe more clearly what constitutes notice to a potential claimant from a competent medical authority that he has a compensable related disease. As presently phrased, the statute is satisfied by the fact that claimant was told by Dr. Steelman that he had a breathing problem which he would have "all his life" and that if he went back into the card room of the mill to work it would "kill" him. Relief from the statute's employee notice provisions is available, if at all, only through the legislative process.